LOUIS BAJUS, Respondent, *v.* THE SYRACUSE, BINGHAMTON AND NEW YORK RAILROAD COMPANY, Appellant.

A railroad corporation is not bound to furnish to its employes engines adequate in power for every emergency ; it is for it to determine how powerful the engine shall be at any place and for any purpose, and if an accident happen to an employe which would not have occurred had a more powerful engine been employed, it is not liable.

It is immaterial in such a case whether the engine was originally of moderate power, or its power has been reduced by some defect.

*Bajus v. S., B. & N. Y. R. R. Co.* (34 Hun, 153), reversed.

(Argued April 22, 1886 ; decided October 12, 1886.)

APPEAL from judgment of the General Term of the Supreme Court, in the fourth judicial department, entered upon an order made October 7, 1884, which affirmed a judgment in favor of plaintiff, entered upon a verdict, and affirmed an order denying a motion for a new trial. (Reported below, 34 Hun, 153.)

This action was brought to recover damages for injuries alleged to have been caused by plaintiff's negligence.

The material facts are stated in the opinion.

*Louis Marshall* for appellant. A master is under no obligation under all circumstances to make use of the safest known appliances and instruments, nor is he responsible for a failure to discard one which is not such and to supply its place with something safer. (2 Thomp. on Neg. 983 ; *Jones* v. *Granite Mills Co.*, 7 Rep'r, 146 ; *Piper* v. *N. Y. C. R. R. Co.*, 1 T. & C. 290 ; *Salter* v. *D. & H. Can. Co.*, 3 Hun, 338 ; *Hayden* v. *Smithville Manufg. Co.*, 29 Conn. 490 ; *Kelley* v. *Silver Spring Co.*, 12 R. I. 112 ; *Wright* v. *N. Y. C. R. R. Co.*, 25 N. Y. 566 ; *DeGraff* v. *N. Y. C. & H. R. R. R. Co.*, 76 id. 125 ; *Ft. Wayne R. R. Co.* v. *Gildersleeve*, 33 Mich. 133 ; *Ind. R. R. Co.* v. *Flannagan*, 78 Ill. 365 ; *DeForest* v. *Jewett*, 88 N. Y. 264.) The mere existence of a defect; the mere occurrence of an accident; the mere omission of a duty is not sufficient to create a liability. It is necessary to proceed further and to show that the defect or omission of duty caused

the accident. (*Marble* v. *City of Worcester*, 4 Gray, 481;
*Fogg* v. *Nahant*, 98 Mass. 578; *Haley* v. *Earle*, 30 N. Y. 208;
*Cosgrove* v. *N: Y. C. & H. R. R. R. Co.*, 13 Hun, 329;
*Barringer* v. *N. Y. C. & H. R. R. R. Co.*, 18 id. 398; *Paka-
linsky* v. *N. Y. C. & H. R. R. R. Co.*, 82 N. Y. 424; *Mor-
rison* v. *N. Y. & N. H. R. R. Co.*, 32 Barb. 568; *Sheldon* v.
*H. R. R. R. Co.*, 29 id. 226.) The proximate cause of plain-
tiff's injury, according to his own statement, being the catching
of his foot by the brake-shoe, and that accident not being
attributable to the defendant, it is not liable for the conse-
quence. (*Fogg* v. *Nahant*, 98 Mass. 478; *Hoffnagle* v. *N.
Y. C. & H. R. R. R. Co.*, 58 N. Y. 608; *Crain* v. *Petree*, 6
Hill, 522; *Lowery* v. *W. U. Tel. Co.*, 60 N. Y. 198.)
The plaintiff in attempting to uncouple the cars by getting in-
side the rails while the train was in motion, and by continuing
to move along with the train after he ascertained that the pin
would not pull, was guilty of contributory negligence, which
should debar a recovery. (*Morrison* v. *E. R. Co.*, 56 N. Y.
302; *Phillips* v. *R. & S. R. R. Co.*, 49 id. 177; *Van
Schaick* v. *N. Y. C. Co.*, 43 id. 227; *Tuomey* v. *Turner*,
24 Hun, 599; *O'Mara* v. *Del. & H. C. Co.*, 18 id. 292;
*Timmons* v. *Cent. O. R. R. Co.*, 6 Ohio St. 105; *Penn. R. R.
Co.* v. *Hankey*, 93 Ill. 580; *Toledo R. R. Co.* v. *Asbury*,
84 id. 429; *C. & A. R. R. Co.* v. *Bush*, 84 id. 570; *Mul-
downey* v. *Ill. C. R. R. Co.*, 39 Iowa, 515; *Williams* v. *Cent.
R. R. Co.*, 43 id. 396; *Kroy* v. *Chi. R. R. Co.*, 32 id. 357;
*Marsh* v. *So. Car. R. R. Co.*, 56 Ga. 275.) The court should
charge as requested by defendant's counsel, that if the plain-
tiff knew, as well as the defendant's board of directors, of the
existence of defects in the locomotive in question, or had the
same means of knowledge, he cannot recover. (*Warner* v.
*Erie R. Co.*, 39 N. Y. 476.) In order that the plain-
tiff may recover, the jury must be satisfied, from the evidence,
that the plaintiff had not knowledge or the equal means of ob-
taining knowledge of the defects in question, as were possessed
by the defendant. (*Wright* v. *N. Y. C. Co.*, 25 N. Y. 566;
*Gibson* v. *Erie R. Co.*, 63 id. 449; *Mehan* v. *N. B. & R.*

R. Co., 73 id. 285; De Forest v. Jewett, 88 id. 264; Kelly v. Silver Spr Co., 12 R. I. 112; McGlynn v. Brodie, 31 Cal. 376, 379.)

*William P. Goodelle* for respondent. The defendant was guilty of negligence in employing such machinery as the engine in question in the business of handling trains in a freight yard; and such negligence caused the injury. These questions were properly submitted to the jury. (*Cone* v. *D., L. & W. R. R. Co.*, 13 Hun, 172; affirmed, 81 N. Y. 206; *Brabbits* v. *Chi. & N. W. R. R. Co.*, 38 Wis. 289; *Ellis* v. *N. Y., L. E. & W. R. R. Co.*, 95 N. Y. 546; *Wasmer* v. *D., L. & W. R. R. Co.*, 80 id. 212; *Laning* v. *N. Y. C. R. R. Co.*, 49 id. 521; *Flike* v. *B. & A. R. R. Co.*, 53 id. 549; *Plainton* v. *N. Cent. R. R. Co.*, 83 id. 7; *Fuller* v. *Jewett*, 80 id. 46.) Even if the plaintiff had been placed in a perilous situation by his own negligence, and yet ordinary care, in furnishing suitable machinery, on defendant's part, would have prevented the injury, the latter is liable. (*Wasmer* v. *D., L. & W. R. R. Co*, supra; *Radley* v. *Lond. & N. W. R. R. Co.*, 18 Eng. Rep. 37, 42; *Austin* v. *N. J. Steamboat Co.*, 43 N. Y. 75, 82.) It was for the jury to determine in this case whether or not the plaintiff was guilty of contributory negligence. (*Mehan* v. *S. B. & N. Y. R. R. Co.*, 73 N. Y. 585; *Hawley* v. *N. C. R. R. Co.*, 17 Hun, 115, 118; affirmed, 82 N. Y. 370; *Kain* v. *Smith*, 89 id. 376; *Palmer* v. *Dearing*, 93 id. 7; *Laning* v. *N. Y. C. R. R. Co.*, supra.) The promise of another engine, then in process of construction, relieved plaintiff from any imputation of negligence in this regard. (*Laning* v. *N. Y. C. & H. R. R. R. Co.*, supra; *Patterson* v. *Pittsburgh R. R. Co.*, 76 Penn. St. 389; *Palmer* v. *Dearing*, supra.) It was not negligent for plaintiff to attempt to uncouple the cars while the train was in motion. (*Plank* v. *N. Y. C. & H. R. R. R. Co.*, 60 N. Y. 607; *Snow* v. *Houston R. R. Co.*, 8 Allen [Mass.], 441; Thompson on Neg. 10, 19; *Williams* v. *Iowa Cent. R. R. Co.*, 43 Iowa, 396; *Muldowney* v. *Ill. Cent. R. R. Co.*, 39 id. 615.) The catching of the plaintiff's foot by the brake-beam was not

the proximate cause of the injury any more than was the engine's becoming started originally, and if the plaintiff was so caught without the fault of any one, or even by his own negligence, the defendant is liable, since by the exercise of ordinary care, with reference to furnishing suitable machinery and keeping it in repair, the defendant might have prevented the injury. (*Radley* v. *Lond. & N. W. R. Co.*, 18 Eng. Rep. [Moak's Notes] 37, 42; *Merritt* v. *Fitzgibbons*, 29 Hun, 634; *Ring* v. *City of Cohoes*, 77 N. Y. 83; *Wasmer* v. *D., L. & W. R. R. Co.*, 80 id. 212, 218; *Austin* v. *N. J. St. Co., supra; Ellis* v. *N. Y., L. E. & W. R. R. Co., supra.*)

EARL, J. The plaintiff was, in 1877, the yard-master of the defendant at Syracuse, and as such it was his duty to superintend and aid in the shifting of cars and to couple and uncouple cars. The shifting engine at that place, on the day alleged in the complaint, was attached to twelve cars, and, after drawing them a short distance up an ascending grade, it became stalled, and then, under the direction of the plaintiff, the engine was backed so as to enable him to uncouple some of the cars. For that purpose he went between two cars while they were moving slowly backward, and his foot caught under a brake-beam and he was dragged along, about forty-five feet, when a car wheel ran over one of his legs and crushed it so as to make amputation necessary. This action was brought to recover damages for the injury thus caused, and the claim of the plaintiff is that the injury was due solely to neglect chargeable to the defendant.

The plaintiff does not complain that the road-bed, or the cars, or any of the appliances which he was required to use were insufficient or out of order. His sole complaint is that the engine was out of repair and insufficient for the use to which it was devoted, and against it he makes these complaints which I will notice specially:

1. The flues of the engine were foul and somewhat stopped up. The only effect of this was that steam was generated less rapidly and the power of the engine was thus diminished.

2. The main valve in the steam chest leaked and that diminished the power of the engine by just so much as the steam escaped, and had no other effect.

3. But the more serious defect was that the throttle-valve leaked. One effect of a leakage of steam through the throttle-valve is that the steam cannot be entirely shut off, and the consequence is that an engine with such a defect may move from its position when placed at rest unless blocked. But when the throttle-valve is open and the engine in motion there can be no leakage, as all the steam passes through the open valve; and hence this defect does not interfere with the power of the engine. There is another effect caused by the leaking of the steam through the throttle-valve, which is the only one, so far as I can perceive, which can be claimed to have any bearing here. In the case of such leaking, it is frequently more difficult to throw over the lever and thus reverse the engine. The claim of the plaintiff is that, when his foot was caught, he immediately signaled the engineer to stop, and that, if the throttle-valve had been in order, the engineer could have more readily reversed the engine and thus have arrested its motion before his leg was crushed. But the difficulty with this claim is, that the undisputed facts stand in its way. There is no proof that the engineer saw or heard plaintiff's signal when he first gave it. The only person who was upon the engine and saw what took place there was called as a witness by the plaintiff, and he testified that, when the engineer heard the signal given by the plaintiff, he at once threw over the lever and reversed the engine, and that he did this quickly, and without any difficulty, and thus arrested the motion of the engine, so that thereafter it passed backward only about five feet.

The defect in the throttle-valve, therefore, had no relation whatever to this accident, and the plaintiff's sole reliance for the maintenance of his action must be upon the defective condition of the flues and of the main steam valve, the sole consequence of which was the diminished power of the engine. These defects may have diminished the power of the engine by several horse-power, so that

the engine, instead of being, for instance, eighty horse-power, was only seventy. It matters not that this diminished power came from these defects, nor how the engine came to be of only seventy horse-power. The responsibility for the defects is no greater than it would have been if the defendant had furnished a new engine of precisely the same power. The plaintiff was familiar with the capacity and power of the engine and was in no way entrapped or deceived by its use. Suppose, then the defendant had furnished a new engine of seventy horse power — precisely the same power which we may assume this had at the time of the accident — upon what principle could it be said that it would be liable for such an accident? Can it be laid down as a principle of law that it is bound to furnish to its employes engines suitable and adequate in power to every emergency? Who but the employer shall determine how powerful an engine shall be at any place and for any purpose? Suppose, at this place, the defendant had furnished an engine capable of moving but three cars at a time and running but ten miles an hour, and the plaintiff had known it, could he justly complain of it? Would such an engine, in any legal or proper sense, be dangerous? If an employer should furnish to an employe a horse which, from natural weakness or from disease, should not have strength for the work in hand, and the employe should, in consequence thereof, receive some injury, could he hold the employer responsible for his damages? These inquiries need not be pursued. The answers to them are obvious. This was not a dangerous engine and it did not cause the injury. That was caused by the brake-beam accidentally catching plaintiff's foot, and the engine simply failed to rescue him from the danger in which he was placed. It was an accident which the defendant had no reason to anticipate and, hence, it was not bound to have an engine there adequate to avert its consequences. It cannot be charged with negligence, in not foreseeing that such an accident might occur and that then the engine would lack power to stop suddenly enough to ward off injury. A more powerful engine could start a train more suddenly and, for the same reason, could stop one more suddenly.

It would impose upon every railroad company very embar-
rassing, onerous and unjust responsibilities if, in the case of acci-
dents with moving trains, it was to be a subject of inquiry be-
fore a jury, whether the particular accident might not have
been avoided with an engine of greater or less power.

If this engine, drawing a train upon a railroad, had, in con-
sequence of its imperfect condition, become stalled so that the
passengers and freight failed to reach their destination in
proper time, or if it had broken down and thereby injured
some one, or if when placed at rest it had run away in conse-
quence of the leakage through the throttle-valve, different
questions would have been presented for our consideration.
But, without violating any rules that have been laid down for
the protection of employes, we are constrained to hold in this
case that this was not as to the plaintiff a dangerous engine,
that it was reasonably safe and proper, and that there was no
negligence on the part of the defendant in putting it to the
service in which it was employed, and that, therefore, upon the
facts, as they now appear, the plaintiff has no cause of action
against the defendant; and this conclusion finds ample support in
the cases of *Burke* v. *Witherbee* (98 N.Y. 562); *Marsh* v. *Chick-
ering* (101 id. 396); *Sweeney* v. *B. & Jones Em. Co.* (id. 520).
In the case of *Marsh* v. *Chickering*, Judge MILLER, following
prior authorities, said: " The rule is that the master does not
owe to his servants the duty to furnish the best known or con-
ceivable appliances; he is simply required to furnish such as
are reasonably safe and suitable, such as a prudent man would
furnish if his own life were exposed to the danger that would
result from unsuitable or unsafe appliances." Suppose in that
case the ladder had when new been furnished with hooks and
spikes and they had by use been broken off, how could it have
been claimed that the liability of the master would be differ-
ent? Would the master have been bound to replace hooks
and spikes which had come off while he owed no duty to his
servant originally to place them upon the ladder? So, here,
was the defendant bound to restore this engine by repairs to
the power which it originally possessed while it owed no duty

to purchase a new engine of greater horse power than this then possessed? It is plain that the answer to these questions should be in the negative. (*Jones* v. *Granite Mills*, 126 Mass. 84; *Kelley* v. *Silver Spring Co.*, 12 R. I. 112; *Smith* v. *St. L., K. C. & N. Ry. Co.*, 69 Mo. 34; *Fort Wayne, etc., R. R. Co.* v. *Gildersleeve*, 33 Mich. 133; *Western, etc., R. R. Co.* v. *Bishop*, 50 Ga. 465; *Wonder* v. *R. R. Co.*, 32 Md. 411; *Philadelphia, etc., R. R. Co.* v. *Keenan*, 103 Penn. St. 124.)

The judgment should, therefore, be reversed and a new trial ordered, costs to abide event.

DANFORTH, J. (dissenting). Upon the trial it appeared that the plaintiff was in the service of the defendant as yard-master, and in the performance of his duty was shifting cars in its freight yard. The train of twelve cars, part of them empty, was drawn a short distance up a slight grade toward a switch where part were to be cut off, but the resistance proved too much for the engine and it was stalled. The train was then slowly backed to enable the plaintiff to take off a portion of the cars. To do this he stepped between the third and fourth car, but found a square pin driven fast in a round hole and immovable. He then tried the other, all the time keeping up with the movement of the train; this pin also was tight, and before he could remove it his right foot was caught between the brake-beam of the car behind and the ground. He at once signaled and the engineer attempted to stop, but before he succeeded the plaintiff's other foot caught in a frog, and he was pulled partly down, the car wheel ran upon his leg, and when the train stopped the wheel stood on his knee, which was of course fractured and the leg afterward amputated. Between signaling to stop and the final stroke the plaintiff, pushed also by the brake-beam, had hobbled along on one foot the length of a car and a half, or forty-five feet. He recovered damages upon the ground that the injuries complained of resulted from the defendant's failure, in the exercise of ordinary care, to provide a suitable engine for his use in the work required. It is too well settled to permit discussion, that a

master is under an obligation to use due care to supply its ser-
vant with suitable instruments and means to carry on the busi-
ness intrusted to him.    That a locomotive engine was necessary
upon occasions like the one in question, that one was fur-
nished, and that it in fact was defective I do not understand
to have been controverted.    Indeed, at the end of the plaintiff's
case, and again at the close of the evidence on both sides, the
defendant, in moving for a nonsuit, claimed not that no defect
was proven, but " that the evidence failed to establish any
defect in the locomotive which contributed to plaintiff's
injury;" and again, that "it fails to show that any defect
existed in the locomotive of sufficient importance to charge the
defendant with knowledge of its existence," or that it was " of
a sufficiently serious character to charge the defendant with
negligence in permitting the locomotive to be used in its busi-
ness."    By implication certainly the existence of defects was
conceded and their effect and consequence only called in ques-
tion.    The motion being denied, the propositions involved in it
were submitted to the jury in a charge to which no exception
was taken.    They were told to inquire, " first, whether the
engine in question was actually unsafe or not, and secondly,
whether the defendant knew or ought to have known of its
condition."

The trial judge also said to them : " It is not only necessary
that the plaintiff should satisfy you that the defendant was
guilty of negligence, but also that this negligence caused the
injury of which he complains."    And calling attention to the
particulars alleged against the defendant, added : " Did these
defects, if they existed, the defect in this throttle-valve, the
defect in this main valve, either or both combined, cause this
injury ?"

He also said : " If you find that the defects existed, that the
defendant had notice of them, and that those defects caused
this injury, then you reach the third question of fact, and that
is whether or not the plaintiff was guilty of any negligence
on his part that contributed to this injury," adding "No mat-
ter how gross the negligence of the defendant may have been

on the occasion in question, if the plaintiff, by slight negligence on his part, contributed to the injury which he received, he cannot recover." And these questions having been answered by the jury in favor of the plaintiff, the propositions to which the attention of the trial judge was called are restated upon the appellant's points, and upon them the defendant mainly relies to get rid of the finding of the jury. As to the alleged want of care or vigilance on the plaintiff's part, it is enough to say that the evidence was quite sufficient to permit that tribunal to find that there was no departure by him from the line of duty, or the requirements of his service, no recklessness or carelessness on his part, contributory to the accident, or even zeal without knowledge, but on the contrary, a faithful application by him to the work in hand, of the lessons of a long experience in similar operations.

The substantial question is, whether there is evidence reasonably tending to show that the injury resulted from any defect in the engine. Its throttle-valve leaked. So did its main valve, or as it is sometimes called, the valve in the steam chest. Its flues were badly stopped up. The various uses of these parts of the engine are explained by witnesses. The flues connect the fire-box with the smoke-stack and present the radiating surface through which heat is conducted to the water, and steam generated. The throttle-valve admits or shuts off steam from the cylinders, and regulates its supply. The valves in the steam chest are intended to govern the admission and exhaust of steam to and from the cylinder, and when in fit order to perform its function, will admit steam to one end only of the cylinders at one time, and allow its escape from that end as soon as it is admitted to the other, and must cover the steam ports so as not to permit steam to escape from the chest into the exhaust port. The throttle-valve is controlled by the engineer. He may direct the steam into either end of the steam chest and thus give a backward or forward motion to the engine, or exclude it altogether and make it motionless. It is obvious then that it is of the greatest importance that a throttle-valve should remain closed and tight after steam is shut

off. If it opens accidentally by reason of defective gearing, or other cause, or if it is so worn as to leak, that result follows which led to the action of *Cone v. Del., Lack. & West. R. R. Co.* (80 N. Y. 206). There through a leaky valve, steam escaped into the cylinder, the engine was put in motion without the intervention of the engineer, the plaintiff was crushed between two cars, and the defendant, by reason of the unfit condition of the engine, was charged with negligence and held liable for the injury. The evidence shows that the engine in the case at bar was in the same condition. It had more than once before this accident moved off when no person controlled it. It had been left standing, but the steam passed into the cylinder in spite of the adjustment of the valve by the engineer, with intent that it should remain stationary. Speaking of the very time of the accident, one witness says: "Neither the engineer nor any other man could shut the throttle-valve off so that she would stay still;" to effect that, besides placing the lever in the center, it was necessary to block the wheels — a stick placed each side of the driving wheel, so she could go neither one way nor the other. Again: "The throttle-valve leaked whenever the engine was used;" "the throttle would leak so the steam would accumulate in the cylinder, so when you went to throw over" (the lever) "you couldn't, and when you did throw over, she would jump, and you couldn't couple after her with safety as you ought to do;" and illustrating the effect of the unregulated passage of steam through the leaking valve into the chest, the witness says: "You could not depend upon her, if you threw her a little too far ahead she would take a jump, and if you threw her the other way she would jump backwards; at that rate you can't couple cars. If the engine was going backward and you wanted to stop her, the engineer would throw her, and the minute he got over so the steam got over the other side of the piston, he would throw her up in the center; the engine would churn backwards and forwards till the steam got out of the cylinder."

Another witness familiar with the engine and accustomed to its use, states that when wishing to keep it stationary he not

only "hauled her up in the center," but "put a block on each side of the driving wheel and set the brake on the tender." Another witness, an engineer in defendant's employ on and before January 27, 1877, and then running this engine, says: "At that time the engine was in very bad condition; her main valve leaked — that is, the steam blew through; that is what I call leaking; the throttle-valve leaked, and she was a very hard engine to handle.  *   *   *  A leaky throttle-valve, to my notion, makes an engine harder to handle and a good deal worse to stop. I think that when the throttle leaks that of course throws the pressure on the valve all the while, when the throttle leaks, and the more pressure on the valves the harder it is to handle the engine; that is my idea of it."

Another, an engineer of abundant experience in the yards of the Central Railroad Company in shifting trains, and whose competency is not disputed, says, in answer to a question embodying the defects referred to, that such an engine is not in a safe condition to do shifting with, because "you wouldn't have control of it." If you receive "a signal to stop, you can't stop any too quick. When you are stopping, if you have an engine with a leaky throttle, moving along slowly, as you would be, of course the steam would act against you; you would naturally have a little momentum, and shut your throttle off with your hand on the lever ready to reverse at the signal, and if that throttle leaked it would be just the same as if the throttle was partially opened and the steam flowing on into the dry pipes, and from the dry pipes into the steam chest, and of course if you reverse your engine you might get it over and you might not. If you are just slacking up to uncouple, and you give her a little steam, and then shut her off and move back by the momentum you have got, a leaky throttle would have the same tendency as though the throttle was open, upon your motion backward it increases your motion as long as you don't reverse your lever. If your lever is in the backward motion and you shut off the throttle, then if she leaks it gives you more momentum, to the extent of the leak." Again the witness says: "A leak in the throttle has the effect upon a locomo-

tive which would be had if the throttle were partly open, that is to say, there is always some steam passing down to the steam chest, and its effect is solely upon the power of the engineer to manage the lever; it takes the certainty of handling the engine away from him; its effect is to interfere with the management of the locomotive."

As to the existence of these defects, and their importance, therefore, the evidence is overwhelming. Did the defendant have notice of them? Possibly not in words that the valves leaked, that this or that particular part was affected, but of the general weakness and inutility of the engine, reiterated notice. In the first place it was an old engine and repeatedly in the defendant's repair shops. Harvey, who for four years ran for the defendant, and this engine in January, 1877, describes her defects, and asked the master mechanic " to do some work upon her." He said he " was short of engines, and just as quick as he got a chance, he would take the engine and do some work upon her." Some weeks before the accident the plaintiff knew of the engine running away, and that it was not in good condition; what ailed it he. did not know, but he reported the engine to Niver, the superintendent. I told him, he says, that " I was not able to do my work with that engine. He asked me what was the matter with her, and I. told him I didn't know; so he gave me an order on the master mechanic to give me another engine; but he had nothing to give me in place of it. He gave me an order; that (producing a paper) is the order; he wrote it and signed it." These are its words: " Buchanan, give the yard-master some other engine to do the work. (Signed) W. K. Niver." Niver was a witness for the defendant. He denies nothing of this. Asked by defendant's counsel a single question: " Were you ever notified by anybody, prior to this accident to Mr. Bajus, that that engine as to its valves was out of condition?" he answers: " I have no recollection of ever being notified of any such thing; I had no knowledge of its being out of repair with reference to its valves."

The master mechanic, however, was not unfamiliar with

the seat of probable trouble.   Testifying for the defendant, he says, the engine was rebuilt in 1874, the valves were then fixed by facing and surfacing, and three weeks after that she came back for repairs, and her throttle was fixed again, and how often it was at the repair shop after that is not stated.

The evidence disclosed not merely a feeble and inefficient machine, but an impaired one.   The trouble was not in its original design, but came from age and wear.   It needed repairs.   The necessity for them was known by the defendant, but they were not made.   Did the defects cause the injury ? The circumstances of *Cone's Case* (*supra*) illustrate the effect of an untimely application of steam through machinery designed, but which through imperfection failed to shut it off. Those of the case at bar are, in one respect, different.   The engineer was at his post, seeking to obey the signal of the plaintiff.   He wanted to stop the engine.   He changed the lever to the forward motion, and this should have directed the full head of steam into the forward port, and would have done so if the valve had not leaked and so permitted part to go into the other.   The travel of the valve is placed under the control of the engineer, that he may employ the greatest power of the engine by admitting steam into the cylinders, or by excluding it, suspend motion, as in his judgment the exigency of the case requires.   Unless it responds to his will, the machine is necessarily imperfect.   If the steam, without his action, can pass into the port-ways, to some extent he loses control over it, and must overcome its resistance before his own will can be effective.   In such a case there is not a mere loss of power, but a misapplication of power.   The steam passing out is met by steam coming in, and the motion of the piston is necessarily hindered.   So, as we have seen, it is testified to in this case, the engineer in an effort to control the engine " would have," as the witness says, " to operate against all the steam in there " (the chest).   " If the throttle-valve had been tight, there would have been no steam in there."   Again the witness says : "It is harder to handle an engine when the throttle leaks, than when it does not leak."   So, although "you shut

her off in the backward or forward motion, and the throttle leaks, she would go that motion." In other words, the shut-off is not effectual. The steam still enters the chest. Thus it is apparent that these parts of the engine were so worn and out of repair as to defeat the object for which they were constructed, that they caused the machinery to act independently of the control of the engineer, and took from him the power to stop quickly, or make sudden starts, as the emergency of coupling or uncoupling, or making up a train, required. In other words, a machine whose motor was intended to be distinct from its operator and so controllable by him was made by these defects to act automatically both as to power and movements. In its principal operations it was independent. Hence when the plaintiff gave the signal to stop, the engineer sought to do so, but although the train was backing slowly, the engine failed to obey. If sound and in good order, it should have become motionless after a few revolutions of its wheels, or as the jury might have found, in the traverse of less than ten feet. Had it done so, the plaintiff would not have suffered. It actually passed over forty-five feet, and the injury occurred. It surely cannot be said as matter of law that it was not brought on by the incapacity of the engine, by reason of its defective condition, to be subject to the will of the engineer, nor that the steam on which he had a right to rely as a power to do his bidding was not in fact applied in resistance to his intent. Nor can we say that the resistance of the escaping steam, nor the prolonged motion, made inevitable by the unexpected restraint upon the lever, was not the material and efficient cause of the accident, nor that by reason of the leaky throttle-valve, motive power was supplied while the engineer sought and expected to exclude it. To save the plaintiff it was necessary to shut off steam and at once stop the engine. The leaky throttle was, as a throttle partly open, and made that impossible. It might even accelerate and prolong motion, which, except for that, would have been suspended. In any view, the action of the engine was shown to have been unnatural, and its eccentricity due to its defective condition.

It was in evidence that if it had been sound and of normal capacity, the engineer might have so checked and controlled the train as to insure the plaintiff's safety. It was, therefore, for the defendant to prove that the injury was caused without its fault, and to be accounted for by other causes than one produced by its negligence. (*Seybolt's Case*, 95 N. Y. 562, 570.)

In *Flike's Case* (53 N.Y. 549) the train had one less than its usual number of men, and the evidence tended to show that if the absentee had been there, he, with the others, could have controlled the impetus of the cars and prevented the accident. The defendant was held liable, the court saying, " as well might the company be relieved if the train had started without an engineer, or without brakes, or with a defective engine." There the injury was occasioned by collision with cars accidentally broken from the train, and the principal protection in such cases was said to be the prompt and efficient application of the brakes, and the defendant held liable because a sufficient number of men to perform that duty were not present. Here we have the defective engine instead of the absent brakeman. In principle the cases are not unlike. In this a sound appliance was lacking; in that the full tale of operators. The contract implied between the parties is the same ; the character of the negligence is the same; the consequences of the default the same; and a difference in liability can stand upon neither reason nor authority.

But in any aspect the question presented turns in part at least upon these considerations, and is one of fact; the jurors passing upon it have found that the injury not only came from the defects, but that the consequences were such as might naturally result from them under the circumstances in which the plaintiff was placed, and that the defective condition of the engine was imputable as negligence to the defendant through the non-performance of a positive duty to make those repairs which it knew, or which from their character it might have known, were needed for the efficient and safe operation of the machine. Clearly the evidence was sufficient in some reasonable view to justify these conclusions. It was, therefore,

properly submitted to the jury, and the judgment should be sustained upon the ground warranted by their verdict, that the defendant failed in its duty to furnish to its servant machinery reasonably fit for the use to which it was to be applied, and in a condition not to endanger his safety. To hold otherwise would relieve the defendant from just responsibility to its employes, and go far to abrogate a rule of action which up to this time we have declared to be unqualified, and by which a master is required to use all reasonable care, diligence and caution in providing for the safety of those in his employ, and furnishing for their use in his work, safe, sound and suitable tools, implements, appliances and machinery in the prosecution thereof, and keeping the same in repair (*Benzing* v. *Steinway*, 101 N. Y. 547), to the end "that the servant shall be under no risks from imperfect or inadequate machinery, or other material means and appliances." (*Laning* v. *N. Y. Cent. R. R. Co.*, 49 N. Y. 521, 532.) So this is declared to be (Id.) "a duty to be affirmatively and positively fulfilled and performed," and in language governing the case before us is added, "there is not a performance of this duty until there has been placed for the servant's use perfect and adequate physical means, or due care used to that end." (Id.)

The cases cited by the appellant furnish no exception to these rules. In *Marsh* v. *Chickering* (101 N. Y. 396), the instrument was perfect of its kind, and so it was in *Sweeney* v. *Berlin & Jones En. Co.* (101 N. Y. 520), and we held that the master was not bound to procure either the best known or conceivable appliances, or discard an old but sound machine for a new invention. The loss to the plaintiff here resulted neither from lack of a new invention, or a different contrivance, but from a known imperfection resulting from the omission to repair a machine which the defendant was bound to keep in order. For these reasons I cannot concur in the judgment about to be rendered.

All concur with EARL, J., for reversal, except ANDREWS and DANFORTH, JJ., dissenting.

Judgment reversed.